UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

CIVIL ACTION NO. 1:09-CV-86-JHM

AMERICAN DAIRY QUEEN CORPORATION                    PLAINTIFFS

V.

FORTUNE STREET RESEARCH AND WRITING INC.,
DAVID E. RIGNEY, and EVA P. RIGNEY                  DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff American Dairy Queen Corporation's (ADQ) Motion for Summary Judgment [DN 34]. Fully briefed, this matter is ripe for decision.

### I. STANDARD OF REVIEW

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The Rule requires the non-moving party to present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). "The mere existence of a scintilla of evidence in support of the

[non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252. It is against this standard that the Court reviews the following facts.

## II. BACKGROUND

Defendant Fortune Street Research and Writing, Inc. (Fortune Street) operated three Dairy Queen® restaurants pursuant to Operating Agreements signed with ADQ. These stores were located in Edmonton, Columbia, and Princeton Kentucky.[1] Defendants David and Eva Rigney were the sole shareholders of Fortune Street and each executed a personal guaranty agreement in connection with the Edmonton and Columbia Operating Agreements, under which they agreed to be bound by the terms of the respective Operating Agreements. The Operating Agreements contained a provision that prohibited Defendants from directly or indirectly operating or holding interests in "any restaurant or fast food business other than one authorized by the Agreement or any other agreement between" ADQ and the Defendants without ADQ's prior written consent. In the event that the Operating Agreements were terminated as a result of a default by Defendants, the Operating Agreements contained a liquidated damages provision that required Defendants to pay ADQ the equivalent of two years worth of licensing fees.[2]

In October 2007, ADQ learned that the Rigney's were operating Rally's® restaurants in Kentucky while also operating their three Dairy Queen® restaurants. ADQ notified the Defendants

---

[1] ADQ does not seek to recover damages in connection with the Princeton location.

[2] Under the Operating Agreements Defendants were required to pay ADQ a monthly continuing licensing fee which was 4% of each restaurant's gross sales. The liquidated damages provision requires Defendants to pay ADQ two times the total amount of continuing licensing fees paid by Defendants over the past twelve months prior to termination.

that they were in breach of their Operating Agreements and gave them time to cure the default by either selling their Rally's® restaurants or exiting the Dairy Queen® franchise system. Defendants decided to exit the Dairy Queen® franchise system and seek a buyer for their three Dairy Queen® Restaurants. In June 2008, Defendants had yet to find a buyer for their Dairy Queen® restaurants and ADQ again notified Defendants that they were in default under their Operating Agreements and that they must sell their Dairy Queen® restaurants immediately. On September 30, 2008, after failing to sell their restaurants Defendants received a formal Confirmation of Termination letter from ADQ.

After receiving the Termination letter, Defendants contacted ADQ and requested more time to sell their restaurants. ADQ agreed to give Defendants more time, on the condition that they execute a Mutual Cancellation and Release Agreement (Cancellation Agreement). The Cancellation Agreement stated that the Defendants had until April 1, 2009 to find a qualified buyer for their Dairy Queen® restaurants. If Defendants failed to sell the restaurants by April 1, 2009 then the parties agreed that the Operating Agreements would be "canceled, terminated and shall have no further force and effect as of April 1, 2009." Furthermore, if the Defendants failed to sell the restaurants by April 1, 2009 they agreed not to operate "any competing restaurant business for a period of one year" at the Dairy Queen® restaurant locations.

The Cancellation Agreement contained a Release Section as well. Under this section, the Defendants agreed to release ADQ from any and all claims known or unknown to Defendants. ADQ then agreed to release Defendants from "their obligations under the [Operating] Agreements, subject to [Defendants'] compliance with this Cancellation."[3] However, ADQ specifically reserved from this release several obligations found in the Operating Agreements including "any post-termination

---

[3] Noticeably, ADQ did not release Defendants from any claims it might have had against them, it only released Defendants from their obligations under the Operating Agreements.

obligations under the [Operating] Agreements." The Cancellation Agreement was executed on January 6, 2009.

During negotiations for the Cancellation Agreement, Defendants' counsel wrote the following to ADQ's general counsel:

> [T]here is one area that we want to have completely understood and that is that *based on the mutual cancellation and release of documents*, that if these Dairy Queens are sold as indicated that there would not be any termination fee relating to any of the Dairy Queens themselves.

(ADQ Memorandum in Support of Motion for Summary Judgment Exhibit L (Emphasis added).)

In response, the general counsel for ADQ stated:

> Please be advised that ADQ will not charge a termination fee for any of these restaurants, regardless of whether the restaurants are sold or whether the franchises end up terminated for failing to sell.

(ADQ Memorandum in Support of Motion for Summary Judgment Exhibit K.)

Defendants were unable to sell their Dairy Queen® restaurants by April 1, 2009 and their franchise rights were immediately terminated. However, Defendants removed the Dairy Queen® name and continued to operate fast-food restaurants at these locations under the name of "Spy Street." The "Spy Street" restaurants had a very similar menu to the Dairy Queen® menu that Defendants had previously sold. Upon learning of this alleged breach of the Cancellation Agreement, ADQ filed this suit seeking injunctive relief, liquidated damages for Defendants original breach of the Operating Agreements, and attorneys' fees and costs.

## III. DISCUSSION

Plaintiff ADQ has moved for summary judgment on Counts II and III of its Complaint alleging that Defendants breached the Cancellation Agreement, thereby reviving ADQ's claim against Defendants for breach of the Operating Agreements. Defendants argue that the Cancellation

4

Agreement terminated the Operating Agreements on April 1, 2009 and that an action under the Operating Agreements cannot be sustained. Defendants further argue that ADQ waived any claim to future lost profits.

## A. BREACH OF THE OPERATING AGREEMENTS

ADQ first argues that it is entitled to liquidated damages for Defendants breach of the Operating Agreements by their simultaneous ownership of both Dairy Queen® and Rally's® restaurants. ADQ contends that Defendants' breach of the Cancellation Agreement revives the Operating Agreements. Therefore, ADQ claims it can seek liquidated damages as provided for under the Operating Agreement. Defendants claim that ADQ is barred from recovering under the Operating Agreements because the Operating Agreements were terminated on April 1, 2009. However, Defendants do not contest the allegations that they breached the Operating Agreement by simultaneously owning Rally's® and Dairy Queen® restaurants and that they breached the Cancellation Agreement by operating "Spy Stores" at the same locations as their previous Dairy Queen® restaurants.

The Kentucky Supreme Court has said that the interpretation of release and settlement agreements is governed by the same rules as contracts. 3D Enterprises Contracting Corp. v. Louisville and Jefferson County Metropolitan Sewer Dist., 174 S.W.3d 440, 448 (Ky. 2005). Under Kentucky law, "'[t]he construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court.'" Dynalectric Co. v. Whittenberg Constr. Co., 2010 WL 4062787 (W.D. Ky. 2010) (quoting Frear v. P.T.A. Indus. Inc., 103 S.W.3d 99, 105 (Ky. 2003)). "Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible." City of Louisa v. Newland, 705 S.W.2d 916, 919 (Ky. 1986). "The primary objective is to effectuate the *intentions* of the parties." 3D Enterprises, 174 S.W.3d at 448

(emphasis added).

When a party seeks to revive a contract that has been cancelled by a subsequent contract or release agreement, the court must determine if the subsequent contract is a novation or an executory accord. See Cioffe v. Morris, 676 F.2d 539, 540 n.4 (11th Cir. 1982). Although very similar, "[t]he distinction between a novation and an executory accord becomes significant in event of breach of the new agreement" because revival of the old agreement can only occur if an accord was executed. Elliot v. W.F. Whitney, 524 P.2d 699, 700 (Kan. 1974); see also Michael J. Benenson Assoc., Inc. v. Orthopedic Network of New Jersey, 2002 WL 31501849 (3d Cir. 2002).

A novation or substituted contract is the "'substitution of a new obligation for an old one with the intent to extinguish the old one.'" M.A. Walker Co., Inc. v. PBK Bank, Inc., 95 S.W.3d 70, 76 (Ky. Ct. App. 2002) (quoting Truscon Steel Co. v. Thirlwell Elec. Co., 96 S.W.2d 1023 (Ky. 1936)). A novation requires the complete termination of the existing obligation, a conditional or qualified discharge of the obligation is not sufficient. 66 C.J.S. Novation § 15 (2010). When a novation is executed, it immediately extinguishes the previous obligation such that the cancelled contract cannot be revived. Coiffe, 676 F.2d at 540 n.4. An accord is "'a method of discharging a claim whereby the parties agree to give and accept something other than that which is due in settlement of the claim and to perform the agreement.'" Mollete v. United Mortg. and Loan Inv., Inc., 2010 WL 1010617 (Ky. Ct. App. 2010) (quoting Bruestle v. S & M Motors, Inc., 914 S.W.2d 353, 354 n.1 (Ky. Ct. App. 1996)). If the subsequent contract is an executory accord (or an accord without satisfaction) then a breach of that contract will allow the non-breaching party to either sue on the accord or on the original obligation. Brown v. Noland Co., 403 S.W.2d 33, 35 (Ky. Ct. App. 1966); see also Elliot, 524 P.2d at 700 ("'Since an accord executory operates at best no more than as a suspension of the antecedent claim, a material breach of the accord by the debtor lifts the suspension and makes the

creditor's prior claim again enforceable'") (internal citation omitted)).

The "essential difference between an accord and a novation is the parties' intent." Paramount Aviation Corp. v. Augusta 178 F.2d 132, 148 (3d Cir. 1999). In Elliott v. W.F.Whitney, the Supreme Court of Kansas was asked to determine if a subsequent written agreement was an executory accord or substituted contract. The court stated that

> 'It is frequently difficult to determine whether a new agreement is a substituted contract operating as an immediate discharge, or is an accord executory the performance of which it is agreed shall operate as a future discharge. *It is wholly a question of intention*, to be determined by the usual processes of interpretation, implication, and construction.'

Elliot, 524 P.2d at 703 (quoting 6 Corbin on Contracts § 1293) (emphasis added).

The Cancellation Agreement executed by ADQ and Defendants contains language evidencing the parties' clear intent. The pertinent provisions of the Cancellation Agreement are as follows:

> WHEREAS, ADQ has defaulted and has the right to terminate [Defendants'] franchise rights for the Restaurant under the [Operating] Agreements as a result of [Defendants'] ownership and operation of a competing business;
> . . .
> NOW, THEREFORE, in consideration of the covenants and promises herein contained, [Defendants] and ADQ, intending to be legally bound, agree as follows:
> 1. Termination of [Operating] Agreements. If [Defendants] fail to sell and complete all transfer requirements of the Restaurant's business assets by April 1, 2009, then *the [Operating] Agreements, and all rights and licenses granted thereunder, are hereby canceled, terminated and shall have no further force and effect as of April 1, 2009* .
> . .
> . . .
> 4. Post-Term Obligations.
> . . .
> c. . . . [Defendants] agree that they will not operate at the Restaurant location any competing restaurant business for a period of one year after the Termination Date.
> . . .
> 5. Release.
> a. [Defendants] release ADQ and its affiliates from any and all claims, demands, damages, actions, or causes of action, at law or equity, known or unknown, contingent or noncontingent accrued or unaccrued, of whatever kind or nature . . . .
> b. Except as noted below, ADQ releases [Defendants] from their obligations under the [Operating] Agreements, *subject to [Defendants'] compliance with this*

> *Cancellation*. Notwithstanding the preceding sentence . . . [Defendants] are not released from any post-termination obligations under the [Operating] Agreements, including without limitation, any non-compete provision.

(ADQ Memorandum in Support of Motion for Summary Judgment Exhibit H (emphasis added).)

Although the Cancellation Agreement provided that the Operating Agreement would be terminated and cancelled in the event the Defendants did not sell the restaurants, it conditioned the Defendants' release from their obligations under the earlier agreement to full compliance with the terms of the Cancellation Agreement. It is clear that the parties contemplated that full compliance with the terms of the Cancellation Agreement would satisfy the obligations under the original agreement.

Therefore, the Court finds that the Cancellation Agreement is an executory accord. There is no genuine issue of material fact as to Defendants' breach of the Cancellation Agreement through their operation of the "Spy Stores" at the former Dairy Queen® restaurant locations. Because Defendants breached the Cancellation Agreement, ADQ can, and has, elected to terminate the Cancellation Agreement and revive its claim based on Defendants' original breach of the Operating Agreements.

Under the Operating Agreements, in the event of a breach by Defendants that results in ADQ terminating the Operating Agreements, ADQ is entitled to liquidated damages. A provision providing for liquidated damages will be upheld so long as it is actually liquidated damages and not a penalty provision. United Serv. Auto. Assoc. v. ADT Sec. Serv., Inc., 241 S.W.3d 335, 340 (Ky. Ct. App. 2006). "Where, at the time of the execution of the contract, damages may be uncertain in character or amount, or difficult to reasonably ascertain, a provision for liquidated damages will be enforced, provided the amount agreed upon is not greatly disproportionate to the injury which might result." Id. at 340-41.

The liquidated damages provision found in the Operating Agreements requires Defendants to pay ADQ two times the total amount of continuing licensing fees paid by Defendants over the past twelve months prior to termination. ADQ contends that this is a valid liquidated damages provision and not a penalty because at the time the Operating Agreements were executed it was impossible to predict the amount of damages that ADQ would be entitled to in the event of a breach. This was due to the fact that ADQ's damages would be the loss of the franchise fees, fees which would be determined by the sales receipts of each store and which were unknown at the time of execution of the Operating Agreements. ADQ has also submitted evidence that it usually takes at least two years to replace a lost Dairy Queen® franchise in a given city, which supports the doubling of the past twelve months fees under the calculation. Defendants do not contest the enforceability of the liquidated damages provisions. Given the uncertainty of future profits at the time of execution of the Operating Agreements, and the fact that it usually takes at least two years to replace a lost Dairy Queen® franchise, the liquidated damages provision is enforceable. For the Edmonton restaurant the damage total calculated under the liquidated damages provision is $22,821.52 and for the Columbia restaurant the total is $70,901.04. Together, the liquidated damages owed by Defendants for their breach of the Operating Agreements is $99,722.56. Defendants do not dispute this total.

### B. WAIVER OF TERMINATION FEES

Defendants argue that even if ADQ can revive the Operating Agreements that ADQ effectively waived its right to any future termination fees through a letter issued by ADQ's general counsel. ADQ contends that the waiver is of a limited nature and became invalid once Defendants breached the Cancellation Agreement.

While negotiating the terms of the Cancellation Agreement, Defendants' counsel wrote the following to ADQ's general counsel:

> [T]here is one area that we want to have completely understood and that is that *based on the mutual cancellation and release of documents*, that if these Dairy Queens are sold as indicated that there would not be any termination fee relating to any of the Dairy Queens themselves.

In response, the general counsel for ADQ stated:

> Please be advised that ADQ will not charge a termination fee for any of these restaurants, regardless of whether the restaurants are sold or whether the franchises end up terminated for failing to sell.

Notwithstanding the constraints of the parol evidence rule on Defendants' waiver argument, the above language simply reinforces the idea that if the Cancellation Agreement was fully performed, no termination fees would be charged. There is no evidence to suggest that ADQ would waive their right to termination fees if Defendants breached the Cancellation Agreement. Finding no genuine issue of material fact as to the enforceability of the Operating Agreements, the Defendants' breach of the Operating Agreements, or the validity of damages claimed under the liquidated damages provision, ADQ's motion for summary judgment on Count II of its Complaint is granted.

### C. ATTORNEYS' FEES AND COSTS

ADQ has also sought attorneys' fees and costs associated with the filing of this action. Under Article 12(c) of the Edmonton Operating Agreement and Article 12(A) of the Columbia Operating Agreement, the prevailing party in an action arising under the respective Operating Agreements is entitled to recover its reasonable attorneys' fees and costs. Defendants have not addressed ADQ's request for attorneys' fees and costs in their response. Having found that ADQ is entitled to summary judgment on its claim under the Operating Agreements, the Court now finds that ADQ, as the prevailing party, is entitled to its reasonable attorneys' fees and costs as provided for under the Operating Agreements. The Court orders ADQ to submit a separate motion with a supporting

affidavit identifying the amount of fees and costs incurred in connection with this matter.

### III.  CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** as follows:

1. The motion by Plaintiff, ADQ, for summary judgment on its breach of contract claim against Defendants Fortune Street, David Rigney, and Eva Rigney [DN 34] is **GRANTED**.

2. The Court awards Plaintiff ADQ damages against the Defendants in the amount of $99,722.56 and its cost incurred herein, including attorney's fees. Counsel for ADQ shall submit a motion and affidavit for attorney's fees no later than November 16, 2010.

cc: counsel of record